The first case to be heard is number 20-3355, Spinner Consulting v. Stone Point Capital. Mr. Dunnigan. Good morning, Your Honor. My name is Bill Dunnigan. I'm for the appellant and I would like to address the California claim, the federal claim, and the Connecticut antitrust claim in that order. My first point is that the District Court incorrectly dismissed the California antitrust claim based upon and only upon the Noor-Pennington Doctrine. Now everyone agrees in this case that with respect to the California claim, the Illinois BRIC rule of direct purchasers does not apply. None of the other defenses which Stone Point has raised apply. So the validity of the California claim is going to deter upon the Noor-Pennington analysis. Now the allegations of the complaint do not come close to a Noor-Pennington defense. Noor-Pennington prevents the imposition of liability upon conspiracies to petition the government and certain acts that are preliminary to petitioning the government. Here the complaint properly alleges a horizontal conspiracy to fix the manner of selling and charging for bankruptcy software services. The conspirators petitioning the government to make their conspiracy easier to affect and then after the government acts, the conspirators executing the horizontal conspiracy. Mr. Donegan, I'm going to interrupt you for a minute because I have a kind of prior question, which is I'm having difficulty seeing how the allegations in the complaint support a conspiracy claim against Stone Point Capital, a hedge fund that has an ownership interest in a company that has a relationship that acquired BMS over time. Your most specific allegations are with regard to BMS and your complaint is full of legal issues that the defendants have raised and that the district court addressed, but I'm having difficulty seeing how your complaint supports Stone Point Capital's involvement enough to Yes, your honor. Let's begin with the standard for imposing liability on an additional conspirator in a conspiracy. Now the standard is you just have to prove that that conspirator agreed to the goals and agreed to conspire with the other people. But Mr. Donegan, you have a chronology problem as well, right? You have Stone Point Capital appearing on the scene in your narrative a couple of years after these claims devolved onto your client, basically, on the Fusari estate, and they joined the conspiracy after, well after the harms you claim were sustained, after the claim arose, and so on. Two years later, I don't see a good basis for holding Stone Point Capital, several steps removed from through that alleged conspiracy. What do you point to? Your honor, I point to Dextone. It's a 1925 decision of this court holding that later joining conspirators are liable for the entire damage caused by the conspiracy, even if they joined later. But wasn't that an ongoing conspiracy? This conspiracy had I mean, still, if you attempt to, if you're a trustee and you attempt to purchase software services for your estate, 99% of the market is only available to you if you agree to put your money in a specified bank and if you agree to pay a percentage of the amount in your estate to the defendants. So any entity that has any relationship, financial relationship, or basically an illegal price-fixing scheme, in your view, is that right? That's not what we're alleging at this point, your honor. I mean, the banks are there, the banks are not the subject of allegations of conspiracy. Stone Point is. Stone Point, the chronology goes, saw how much money that BMS was making off of this conspiracy, realized that they could share in that money, had one of their entities, their funds, purchase BMS, and then controlled BMS to continue the conspiracy. Judge Wesley, go ahead. What do you say to the fact that the Third Circuit's found that BMS has already been released off of that claim with regard to your client? So if BMS is released from its acts, from the acts that allegedly injured your client, how do later acts somehow revive them? Well, your honor, the issue of whether or not you have a antitrust claim against another conspirator, the test for that is set forth in... You'd agree with me, you'd agree with me that BMS, at least a claim against BMS, would face a rigorous res judicata claim with regard to the adjudication at the Third Circuit, wouldn't you? That's what you lost on in the Third Circuit. You can't sue BMS for an antitrust violation, can you? Right, well we did in the Third Circuit. No, you can't. Now, if you sued BMS here, you could not sue them because you'd face a total claim preclusion defense as to BMS, wouldn't you? That is correct. How then is it that you somehow revive that claim for acts that occur over a year later that have nothing to do with your client? Okay, there's two issues you're raising I want to address them separately. The first is res judicata. Res judicata would not apply because the claim against Stonepoint did not exist at the time of the BMS case. Well, that's not what you just told us. You told us Dextone revives earlier claims and that's your whole theory to bring Stonepoint back in is that the earlier claims with regard to the anti-competitive conduct of the conspiracy can be affirmed by later joiners of the conspiracy. Now you're repudiating that. No, I don't think that's correct, Your Honor. I think we have to take it we have to take it one date at the time. The res judicata effect of any adjudication in the bankruptcy is going to depend upon what happened at the time of the bankruptcy pleadings. Set res judicata aside and stick with the idea that there's a general release for which you can't sue BMS for any of BMS' conduct allegedly that's anti-competitive at the time that the predecessor, the assignor, was in bankruptcy. Okay, now to analyze the question of whether or not Stonepoint is released as a result of the May 6th 2016 order, you have to look at the intent of the parties. That's what Hazeltine says. Now if we look at the release language in that order, it's on a 76 of the record. It provides, and I'm reading from paragraph C, third from the last line. Did you not tell me already that BMS is released by that and that's an established fact? The Third Circuit has held that BMS is released. Didn't you just tell me that? That's what I asked you a question. You don't have to tell me what the Third Circuit said. Didn't you tell me, didn't you agree with me that the Third Circuit ruled that that release was good as to BMS? Yes. Okay, thank you. Okay, and the reason why that release is not good as to Stonepoint is if you look at the language on the third line, on page A76, the release applies. I'm not interested in extending it to Stonepoint. I'm trying to understand its implications with regard to whether you can say that a conspiracy that's been released somehow is revived by later acts of alleged conspiratorial conduct that have nothing to do with your client. That's what my interest is in. Thank you very much. Thank you. Judge Nardini, I know you're over time, but Judge Nardini, I thought you may have had a question. No, thank you. I think a lot of my questions have been covered. Thank you. Very good. All right, we will hear from Stonepoint. Good morning, Your Honors. Jonathan Herman for Stonepoint, aptly. Addressing the issue of release, it seems to me it's pretty clear that Stonepoint is released because it makes no sense that BMS and all of its agents, representatives, successors, and assigns should be released, but not Stonepoint. Having acquired an interest in BMS, you know, a couple of years later, essentially, that it doesn't make sense. Well, if you'd acquired, when you acquired BMS, if there were claims that were alive against BMS when you acquired BMS, you'd acquire the claims against BMS because you're a successor and interest to BMS, are you not? Well, yes, in some sense. Although our advocacy is not. Not every question is hostile, Mr. Herman. Not every question is hostile. Now, Mr. Herman, so if the claims have been released, then it seems to me that you step into the same position, don't you? Yes. Okay. And I'm sorry, can I, sort of, following up on that same thread, it seems clear that the estate released its claim against BMS, but not against any of the other alleged co-conspirators, right? That's correct, Your Honor. So, let me just follow that. So, if, hypothetically, we were to agree with your adversary that they had properly alleged an antitrust conspiracy, would they have been limited to suing only BMS, or could they have also alleged the other software, could they also have sued the other software providers, again, assuming that they had properly alleged an antitrust conspiracy? Yes. So, I guess, then, to follow that, again, only if you agree, which you don't, with your adversary's adequate allegations that Stonepoint came in and independently became a co-conspirator in its own shoes, not simply by somehow inheriting the claim against BMS, would it not be the case that the estate and its successors could then bring an antitrust claim against both the remaining co-conspirators who might include Stonepoint? And then it would turn on questions of whether Stonepoint really was adequately alleged to have been a co-conspirator. Well, there are a number of reasons why it doesn't work. One of them is that there was nothing left in the estate whatsoever as of May 6th, 2016, when the release took place. All claims against BMS and everyone else have been released. There was no money in the estate. There was nothing left to pass on. Let me probe that then. I thought there was an express release as to BMS. Was there also a release as to the other alleged co-conspirators, the other software providers? No, they were not in the case. They were not involved because only BMS had provided services in the Fusari bankruptcy. So, that's why I guess my question is, if there was a valid cause of action that existed at the time against all of the antitrust co-conspirators, and the only release was as to one of them, why would the remaining claims against the remaining co-conspirators have been released in the bankruptcy discharge? Well, if you look at Zenith, and I think this answers your question, Your Honor, that was a case in which there were several parties simultaneously acting in a Canadian patent pool, and one of them was released along with his parents and subsidiaries. Then the plaintiff, Zenith, decided to sue Hazeltine at a later patent pool. That was the subject of Zenith's antitrust case, and it made perfect sense for the court to hold that the release of one co-conspirator was not the release of others that were then simultaneously acting to the detriment of Zenith. But this case is totally distinguishable from that for four reasons. First, the release here was at least arguably intended to apply to any co-conspirators. Stone Point was not one of the many co-conspirators causing damage to plaintiff at the time of the release. Stone Point never actually caused any damage to plaintiff here, and as all the alleged damage stemming from the Pozzari bankruptcy unquestionably ceased according to the reclusive effect in December of 2015 before Stone Point ever became affiliated with BMS. At the time that the residuary came to Mr. Pozzari, the residuary had zero in it. There was no money left, and then that the residuary suddenly gained a new asset in 2017 seems rather absurd to me, and it was very troubling to Judge Artiton in the court below, if you see the transcript of that discussion on page A189 through A190. With regard to that not enough here has been pleaded. For that matter, not enough has been pleaded with regard to BMS. All they say is that with regard to Nora Pennington, essentially what the court is saying, citing Singh from this court, is that everything up to April 19, 2011, when the ELUST lifted the ban, was fully protected petitioning. If we were to agree with you that the plaint as currently pled is inadequate on a number of grounds, is there any reason we shouldn't allow, remand for, to allow further amendment? Yeah, there is. It seems to me there shouldn't be, there hasn't been any adequate pleading of plus factors, and I don't believe there could be. I mean, if you look at, for instance, Gelboim, where there was a high level of interfirm communications, that's distinguishable from this case. There are no communications between BMS and its horizontal competitors whatsoever. There's an allegation that after there was an agreement to enter into the new arrangement with the trustee to relax the rule, that there was a conversation among the three providers with regard to the rates that were going to be How isn't that like the trucking case? This doesn't fit within Norr Pennington at all, does it? I mean, the fact that the trustee agrees to relax the rule, if there's then anti-competitive behavior that occurs after that, after the petitions granted with regard to, that creates a situation where anti-competitive behavior can occur, that's not protected by Norr Pennington, is it? No, it isn't, and Your Honor, I agree with you that if there were anything that would, but all they've said in the complaint is that thereafter, the parties acted on their conspiracy, but there are no facts that are alleged. There's no high number, indeed any, of interfirm communications. Weren't the rates all the same? The rates were 1.75, 1.75, and 1.9, were they? But that's not, that's just essentially, that's just interdependent parties in an oligopolistic market that decide that, you know, they have to compete with one another. Actually, the record shows that those rates started at 3.5 percent, zero, and 1.9 percent, so they were completely off, and they changed, and they went up and down with the competition, and more than that, this case is really more like Mayor and Council of Baltimore versus Citigroup, where what you had was an en masse flight from a collapsing market. This market was collapsing. All the banks were refusing to be involved and receive any deposits from Chapter 7 trustees. If something wasn't done to change the market, there would have been nothing, and the market would have collapsed. Actually, the U.S. trustee said that this was pro-competitive, and it was necessary to do something, and that's what was done, and that's why the court also cited that quote from the U.S. trustee. Thank you, Mr. Herman. Why don't you take a minute to wrap up? Sure. So, I think what they did was, they did what was actually what they were lobbied to do, and second, if you look at Stone Point, the allegations against Stone Point, in paragraph 1, it claims that, conclusively, that Stone Point joined a conspiracy with BMS, Epic, and TES. Nobody mentions any contact between BMS, between Stone Point and the others at this point. However, all they do is, everything is in paragraph 75, that there's some business plan that was as far as I know, no business plan. There is nothing, there are no facts pleaded about this plan, what was in it, how it even knew there was a plan, when, where, or with whom Stone Point met, nor does it quote from the plan. It's simply a fantasy. Okay, thank you, Mr. Herman. Kept you past your time. I think we have the Let me try to make five points. First, the issue of release should be a non-issue, because if we look at A76, the third line from the last, the release only applies to parties, creditors, parties in interest, and I'm quoting, their present and former officers, directors, and it goes on. At that point, Stone Point was not a present or former any person in that category. My second point is the res judicata defense. Res judicata defense shouldn't apply, because as of the time of the bankruptcy proceeding, Stone Point was not part of the conspiracy. Third point, Mr. Herman said, and I'm not sure the relevance of this, but he says at the time of the transfer of the estate to Mr. Fusari individually, there was nothing left in the estate. Well, that doesn't come from the complaint, and I can tell you because I was there that that's not true. There were lots of copyrights in that estate, as well as the claims which bring us here today. The fourth point I wanted to make is that the allegations against both BMS and Stone Point are more than adequate to survive a motion to dismiss. The allegations against Stone Point, I mean, we have a memo that BMS wrote in November of 2010 saying that it had conversations with the banking partners of its horizontal conspirators saying that they all agreed that they would charge no fee other than a percentage of the estate, and they would ask that the states put all of the money in one bank. Now, I'm sorry, Mr. Donegan, I know you're making your points very efficiently given your limited time, but what allegations do we find against Stone Point in the complaint other than the ones in paragraph 75? I mean, I know that they're repeated, you know, around paragraph 113, but are there any other allegations of Stone Point's actions that make them, uh, you know, newly joined conspirators besides what is in paragraph 75? What paragraphs of the complaint should I read? Um, that's an excellent question. I think what you, I think it's not really the complaint. I think it's an inference that you can draw from the facts in the complaint. BMS is making an extraordinary overcharge by charging a percentage of the complaint. Stone Point wanted in on that. It arranged or it orchestrated the in. I really do want to hang up. Stay with the complaint here. Okay. Tell me what are the factual premises. I'll figure out what inferences we can draw. Okay. Tell me which of the building blocks actually in black and white in which paragraphs of the complaint. Okay. Uh, there is one paragraph which provides that an agent of ethics, uh, said that a, a rate of 0.05% would be reasonable and the rates that, uh, were actually put into place now are 1.7, 1.7 and 0.9. Now that leads to the, that, that, that indicates or proves that the rates that are charged are going to be some sort of overcharge. Once you have the overcharge allegations in place, then it seems to me a very short step to say that a conspirator wants to share in those percentages. I mean, it seems to me almost common sense that. So it seems like you have two sets of allegations. You have paragraph 75 that's specific to Stone Point. And then the rest of your allegations, you're just saying because Stone Point bought DMS, everything you allege against DMS is now attributable to the mind of Stone Point. No, your honor, that's not correct. In the complaint, we specifically say that we are not alleging successor liability on the part of Stonegate. Oh, I know. But then why are these statements by DMS relevant to determining whether Stone Point has joined the conspiracy? You have to look at whether or not it's plausible to reach the conclusion that Stone Point joined the conspiracy. And it's plausible because one, DMS was making a lot of money. Two, Stone, as a private equity fund, Stone Point would want to share in that amount of money if it could. Three, Stone Point was taking acts to make sure that DMS continued its method of doing business, which is software services would only be sold as in combination with banking services, and it would only be a percentage of the estate. And that last point, you say Stone Point took steps, colon. But the steps that you allege are simply the steps in 75, paragraph 75. I think that I think that's right. Again, unless you want us to simply infer that anything DMS ever did subsequent to their acquisition by Stone Point was attributable ipso facto. I'm not I'm not sure you could say I'm not sure you could say that the facts that we eventually learn later in the case, if there is a later in the case, could show that and that would make the case stronger. But the test at this point is whether or not it is plausible to say that Stone Point understood that there was a conspiracy going on, wanted to be part of it. That's enough. And then the allegations of leaving paragraph 75 provided took additional steps to make sure that that conspiracy would continue. Very good. I think we have the arguments, Mr. Judge. Do you have anything further? No. Okay. Thank you both for your arguments. We'll take the matter under advisement. Thank you, Your Honor.